In the Matter of Cecil Elgin
THOMPSON, Debtor.

Cecil Elgin THOMPSON, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Bankruptcy No. 81–143.
Adv. No. 81–96.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Dec. 16, 1983.

Don M. Stichter, Tampa, Fla., for plaintiff.

George T. Rita, Tax Div., Dept. of Justice, Washington, D.C., Robert W. Merkle, U.S. Atty., Tampa, Fla., for U.S.

## MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 case commenced by the Petition for Relief filed by Cecil Elgin Thompson, the Debtor involved in the above-captioned adversary proceeding. The matter under consideration is the liability of the Debtor, vel non, for payroll taxes which allegedly were not paid by two corporations of which he served as a corporate officer and, therefore, according to the United States Government, Internal Revenue Service (IRS), he was the responsible officer and thus liable for 100% penalty assessment by virtue of 26 U.S.C. 6672.

This controversy originated in the United States District Court for the Middle District of Florida by a complaint filed by the Debtor who sought a tax refund claim against the U.S. Government in the amount of $618. In due course, the Government filed an answer and a counterclaim and asserted that whatever refund the Debtor might be entitled to is offset by a much greater tax liability incurred by the Debtor as the responsible officer in connection with two corporations one known as Structures of America (Structures) and the other, McCollough Construction Co. (McCollough Construction).

On January 30, 1981, the Debtor filed his Petition for Relief and shortly thereafter, pursuant to Rule 7008, removed the civil action from the U.S. District Court to this Court. The record established in this matter basically consists of extensive pre-removal discovery matters including numerous depositions and documentary evidence. In due course, the matter was set down for a final evidentiary hearing and the Court having considered the entire record including the pre-removal discovery matters now finds and concludes as follows:

McCollough Construction was formed in the early 1960's and Lloyd C. McCollough was its president. He also served as the chairman of the board. Mr. Lloyd McCollough was also initially the majority stockholder and the balance of the stock was held by members of his family. In the late 1960's or the early 1970's, the Debtor acquired a minority interest in McCollough Construction and became its vice-president placed in charge of marketing. Shortly thereafter, the Debtor suggested to Mr. Lloyd McCollough that they should explore the possibility of launching a business of constructing modular office buildings. The idea appealed to Mr. Lloyd McCollough who decided to organize a new corporation for the purpose of embarking on this new venture. This lead to the formation of Structures in 1972 and upon its formation, the Debtor became its president; Keith McCollough, secretary-treasurer; Bob McCol-

lough, vice-president; and Lloyd McCollough became the chairman of the board.

Structures had an initial capitalization of approximately $120,000; The Debtor invested $10,000 and had an option to invest an additional $10,000. The balance of the shares were subscribed to and held with some minor exception by the McCollough family. In early 1973, there were numerous changes in the management of Structures. Don Hudenall became the executive vice-president and Clayton Merrill was appointed as vice-president in charge of finance. The Debtor remained as the president of Structures.

Shortly after its formation, Structures established a banking relationship with Valley Trust and Bank Company (Valley Trust), opened a general operating account and also a special account (Df's Exh. A–1). It being in need of additional capital, Keith McCollough negotiated the initial line of credit in the amount of $50,000 with the Valley Trust. At that time, McCollough Construction had a substantial involvement with the Valley Trust and had a half a million dollars credit line. This initial loan was negotiated by Keith McCollough. Although the Debtor was not initially designated as a signatory on the corporate accounts, he was one of the officers authorized to sign notes on behalf of Structures. Within three months, the Debtor was the person primarily involved in all dealings and negotiations with Valley Trust. Between the 1972 and 1975, Valley Trust had numerous requests from the Debtor to increase the line of credit. As the result, the initial advance of $50,000 was ultimately raised to $200,000. The line of credit was secured by inventory, receivables and equipment and it was to be paid back on a demand basis. Later on Structures obtained an additional loan represented by a 90 day note in the amount of $100,000 also secured by inventory, receivables and equipment. All of these notes were signed according to the corporate resolution (Df's Exh. A 1–4), by the Debtor, although the resolution indicates some other officers also had authority to sign notes. It is without dispute that there was no loan made to

Structures except on the signature of the Debtor with the exception of the very first $50,000 note which was negotiated on behalf of Structures by Keith McCollough.

It further appears that McCollough Construction has grown from a $6 million company to an $18 million company in a short period of three years; it was operating in twenty states and, at least during 1972 and 1973, the Debtor was very heavily involved in the operation of the construction company and devoted very little time to the day-to-day operation of Structures. It is without doubt, however, that he was the chief executive officer of Structures who had the undisputed policy making power over the affairs of Structures even though he delegated these responsibilities to others at least during late 1973 and early 1974. It is without dispute that the conduct of the financial affairs of Structures were initially entrusted by the Debtor to Clayton Merrill who was the vice-president in charge of finance during 1972–1973 and early 1974.

The first significant event in the corporate life of Structures and indirectly in the life of the Debtor occurred in April, 1974, when the Debtor received a letter from the accounting firm of Cooper and Lybrand, the accounting firm engaged to handle the accounting work for Structures (Pl's Exh. # 2). The letter of Cooper and Lybrand pointed out approximately nine areas of deficiencies found in the accounting system of Structures. As one of the items of deficiencies there was an observation that the payroll taxes were not handled properly, i.e. they were not paid on time and that Structures was assessed late payment penalties. While it is not clear from the record that in the spring of 1974, Structures was already delinquent in paying the payroll taxes, it appears that by the end of the second quarter of 1974, Structures was already delinquent in its obligation to pay the amount due for payroll taxes in excess of $30,000. In this connection, it should be noted that during this period Structures had as many as 70 employees on its payroll.

Cooper and Lybrand's letter was sent to all stockholders and board members prior to the meeting of stockholders scheduled for April 13, 1974. As the result of the meeting, the board decided to discharge Mr. Merrill and to replace him. In May, at the recommendation of Mr. Hudnell who was at that time the executive vice-president and in charge of the day-to-day operation of Structures, Mr. Bruce Heaberlin was hired to replace Mr. Merrill.

In June, 1974, there occurred an important and dramatic change in the relationship of the Debtor with the McCollough family. Sometime prior to June, 1974, the Debtor formed Thompson Enterprises, Inc. (Enterprises) and through this entity acquired 100% of all of the outstanding stock in McCollough Construction Co. from the McCollough family. As a result, the Debtor became the owner of 80% of the outstanding stock in Enterprises and Lloyd McCollough retained 20% until early 1975 when the Debtor acquired the shares held by Lloyd McCollough and then became 100% owner of all of the outstanding stock in Enterprises. The assumption by the Debtor of the control of the affairs of McCollough Construction plays a significant role according to the Debtor in the determination of the ultimate responsibility of the Debtor for the unpaid payroll taxes of Structures.

As noted earlier, as a result of the meeting in April which was called to discuss the report of the accountant firm of Cooper and Lybrand, the Board of Directors of Structures discharged Mr. Merrill and hired Bruce Haberlin to replace him and placed Mr. Haberlin in charge of the financial affairs of Structures. Mr. Haberlin was fully briefed for the reasons for the change and on the overall problems of Structures as highlighted by the report of the accounting firm, including the problem of the treatment of the payroll taxes by Mr. Merrill prior to his departure. While it is true that this particular problem was not especially emphasized at the early stages of the discussions, the severity of the problem of Structures involving its obligation to remit trust funds representing funds withheld from the paycheck of the employees and the

corresponding duty to remit the employer's contribution and also the social security compensation was evident to all at this time, especially the Debtor. There's no doubt that the Debtor was keenly aware of this particular problem and paid very close attention from that point on to the financial affairs of Structures even though in June he was also, as noted, heavily involved in the affairs of McCollough Construction due to his acquisition of the controlling interest in the construction company.

The record reveals that the Debtor had extensive discussions with Haberlin during the second quarter of 1974 concerning the poor cash position of Structures especially the lack of funds to pay payroll taxes for the second quarter of 1974. The fact of the matter is that the Debtor did approach Valley Trust again for an additional loan and sought additional funds needed to meet the payroll tax obligation for that particular quarter and also to obtain additional funds for working capital. It appears that Valley Trust agreed to advance additional funds and as a result funds were to be transferred by Valley Trust to a tax deposit that was supposed to be set up to handle the payment of payroll taxes. Unfortunately this is not what occurred. The fact of the matter is that Valley Trust did advance additional funds to Structures at the request of the Debtor but none of the funds obtained were used to pay the payroll taxes for the second·quarter of 1974 while other bills of Structures were in fact paid. Thus, during the second quarter Structures paid out more than $91,000; during the third quarter more than $278,000, while none of the payroll taxes were paid. There is no question that at this time the Debtor was the sole person in authority of the affairs of Structures and he was intimately familiar with the financial plight of Structures. The record simply does not support the portrait attempted to be painted by the Debtor that during this time he was merely an innocent bystander, a mere figurehead who was totally oblivious to the financial plight of Structures and especially to its tax position because he was involved only in the

affairs of the construction company and delegated all the responsibility to handling the financial affairs to the accountant, Mr. Haberlin. This record belies this contention. On the contrary, the record fully supports the proposition that he was fully aware of the need to pay the payroll taxes. The Debtor worked closely with Mr. Haberlin and assured him that he will take care of the payroll taxes through arrangements with Valley Trust. Mr. Haberlin informed the Debtor that the situation did not improve during the third quarter of 1974 and that the payroll taxes were not paid for that quarter. It is without dispute that all payroll tax returns for the year of 1974 were signed by the Debtor.

The crisis came to a head in early November, 1974 when the Internal Revenue Service actually commenced procedures to attempt to collect the payroll taxes past due and made the assessment on the Debtor for non-payment of taxes for the second and third quarters of 1974.

As the result, the Debtor summoned a meeting of the Board of Directors for the express purpose of discussing the problems of Structures, particularly the dangerous payroll tax situation.

The meeting was held on November 23 and continued to November 26. During these meetings, the directors learned of the hopeless financial condition of Structures. At that point, the majority of officers resigned and the stockholders verbally agreed to sign over their stock to the Debtor in the event Structures could be salvaged. Structures's financial problems were not solved and in February of 1975, the company went out of business and Valley Trust called its loans and ultimately liquidated its collateral.

As noted earlier, in addition to being the president of Structures, the Debtor was also the president and stockholder of McCollough which also developed serious financial problems in 1974 and ultimately went out of business in April of 1975. But, before it closed down, McCollough also incurred payroll tax liabilities during the first two quarters of 1975. As a result, the IRS assessed an $18,032.30 penalty against the Debtor for willfully withholding employment taxes pursuant to 26 U.S.C. § 6672 (1983).

Under the Internal Revenue Code, employers are required to collect both income and FICA taxes from their employees, IRC § 3401 (1983). The money collected is held as a special fund in trust for the United States. 26 U.S.C. § 7501 (1983). The employee is credited for the taxes withheld even if the money is never remitted to the Government, IRC § 1462 (1983). Once the withholdings are credited to the employee, the Government has recourse only against the employer or the corporate officer who pursuant to § 6672 willfully failed to collect and pay over the taxes.

Section 6672 of the Internal Revenue Code provides in part that:

§ 6672.

"Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall in addition to other penalties provided by law, be liable for a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over."

In order for a penalty to be assessed under § 6672, two conditions must be established. One, there must be a corporate officer, employee or individual who is deemed to be a "person" within the meaning of § 6672. Secondly, the "person" responsible under the duty to collect and pay over the taxes must have willfully violated that duty. *United States v. Hill,* 368 F.2d 617 (5th Cir.1966).

The first issue, therefore, is whether or not the Debtor is a "responsible person" within the meaning of § 6672. The word person is defined in 26 U.S.C. § 6671(b) to include "... an officer or employee of a corporation ... who as such officer or employee or member is under a duty to perform the act in respect of which

the violation occurs." Holding a corporate office does not, per se, impose the duty. However, the duty is generally placed on high corporate officials charged with the general control over corporate business affairs who participate in decisions concerning the payment of debts and disbursal of funds. *Monday v. United States,* 421 F.2d 1210 (7th Cir.1970); *Barrett v. United States,* 580 F.2d 449, 217 Ct.Cl. 617 (1978). The District Court in *Braden v. United States,* 318 F.Supp. 1189 (S.D.Ohio 1970) listed several factors which courts have relied upon to determine whether a person was responsible for the collection and remittance of taxes as follows: (1) duties of the officer as outlined in the corporate bylaws; (2) the ability to sign corporate checks; (3) the identity of the officers, directors and shareholders; (4) the identity of officials who hire and fire employees; and (5) the identity of individuals in control of the corporation's financial affairs. The fact that another person has the same duty does not affect the taxpayer's responsibility. *Monday, supra* 1214; *Moody v. United States,* 275 F.Supp. 917 (E.D.Mich.1967).

■ As noted earlier, the Debtor was not merely a figurehead of Structures, but rather was an active officer and shareholder. The Debtor ran the corporation. He made policy decisions, negotiated loans and had the authority to sign corporate checks. Even though another office may have had similar powers, clearly the Debtor was a "responsible person" as defined by the authority cited above. Moreover, the Debtor could not escape his liability by delegating the authority to another. *Mazo v. United States,* 591 F.2d 1151 (5th Cir.1979).

■ In regards to Structures, the next question is whether the Debtor willfully failed to collect and payover the taxes. An act is willful for purposes of § 6672 if done consciously, voluntarily and intentionally. There is no requirement of bad motive or specific intent to defraud the Government or deprive it of revenue. *Monday, supra* at 1216. Willfullness may be established by showing the person knowingly used corporate funds to prefer corporate creditors

over the United States. *Newsome v. United States,* 431 F.2d 742 (5th Cir.1970); *Monday, supra* at 1216. The corporate officer subjects himself to potential liability when he knowingly risks the withheld funds in the operation of his business. *Newsome, supra* 746.

■ As noted earlier, the Debtor was aware of Structure's financial plight especially the lack of funds to pay payroll taxes. Yet, the funds Valley Trust advanced Structures in the second quarter to meet the payroll taxes were, in fact, used to pay other corporate expenses. In addition, no payroll taxes were paid during the third quarter while Structure's creditors were paid over $278,000.

In light of the foregoing, it is evident that the Debtor knowingly preferred other creditors over the United States. As such, the Debtor willfully failed to account for and pay over the taxes.

The IRS also contends that the Debtor is subject to a penalty under § 6672 for willfully failing to account for and pay over the McCollough Construction Company's payroll taxes for the first two quarters of 1975.

■ There is little doubt that the Debtor was under a duty to collect and pay over taxes for McCollough Construction. The Debtor, however, contends that he did not act willfully in failing to pay over the taxes. The Debtor contends that he was precluded from paying the taxes because Valley Trust exercised their right of set off and closed out the bank account of the construction company. The Debtor states that he was going to use the funds in that account to pay off the tax liability and was prevented from doing so by the set off.

Despite the fact that the Debtor may not have intentionally failed to pay over the taxes he still may have acted willfully under § 6672. Willfullness is established if a person proceeds with a reckless disregard of a known or obvious risk that trust funds may not be remitted to the Government. *Commonwealth National Bank of Dallas v. United States,* 665 F.2d 743, 758 (5th Cir.

1982); *Kalb v. United States,* 505 F.2d 506, 510 (2d Cir.1974).

In the present case, McCollough Construction was in default on its loans with Valley Trust. By placing funds in an account with Valley Trust, the Debtor faced the obvious risk that the Bank would exercise their right of set off. The Bank did, in fact, exercise its right of set off and consequently the Government never received the tax money. Accordingly, the Debtor acted willfully in failing to remit McCollough's first and second quarter payroll taxes and, therefore, he is liable for the penalty imposed by § 6672 of the Internal Revenue Code.

A separate final judgment will be entered in accordance with the foregoing.